All right, the next case before the court, First Quality Baby Products v. Kimberly-Clark Worldwide, Inc. Case No. 151304, this is an appeal from the Patent and Trademark Appeal Board. Mr. George, you want three minutes for rebuttal? Yes, Your Honor, thank you. All right. I assume these demonstratives come right out of your briefs? They do, Your Honor, and I'll identify the page that they come from. Yeah, well, we've all seen them, obviously, but to the extent that you feel like you need them, that's fine. But we've already studied them. You may not have seen them in that size, but we do see them. We're not blind. You don't have to blow them up that big for us. But anyway. Thank you, Your Honor. Okay, proceed. Sure. May it please the Court. The 187 patent and the Herman and Fahn mechanical references are all directed to machines that make training pants, and part of that process is the training pants, when it's made, it's flat, a lot like this brief that I've opened up. But at some point in the process, it needs to be folded over, and then at another point in the process, the sides need to be attached. So you end up with something that looks like a training pant or just a pair of underwear. But before you attach the side panels, you want to keep them separate for a time. And so if we look at the 187 patent, the crux of it really is the yellow separation numbers 230 and 330. Now what's interesting is the side panels, which are in green, the front and back side panels, they're actually held by vacuum. And so they're held by vacuum, they're held apart, you want to hold them apart until you get to the point where you want to attach them. So with respect to the Herman prior art, would the grippy members serve the purpose of the vacuum? That's correct. In the 187 patent? That's correct, Your Honor. I mean, what we have here is the 187 patent has a vacuum. So what do the holding rods in the Herman prior art do? The same thing, almost exactly the same thing as the separation numbers in the 187 patent. It's a belt and suspenders function. It's a partition. You want to keep two things apart. You have two methods in the prior art to do it, a vacuum or gripping members. Fond Mechanica taught vacuum and gripping members, and Herman did the gripping members only. And you're adding these bars really, it's a belt and suspenders to give you a partition to make sure that you keep things separate. And so we have this situation where... But I don't understand how the separation numbers of Herman contribute at all to the separation or orientation of the garment. And clearly it's the gripping members that are doing all the work, right? The gripping members are not doing all the work. And if we could take a look at what I have here, and this seems to be a point of confusion that we've had. Looking at the grape brief in three, and if we look down at figure four at the bottom, the holding rods are actually in between and they're touching, as we can see in figure four, the side panels. And what we have in figure 13, the grippers, 64 and 66, are actually holding the ends of the pant together, touching. And the holding rods, 106 and 108, are actually separating them. But the whole point is that it's dealing with the elastic, right? It's separating the elastic, and if they fail, then the elastic collapses. That's a totally different animal than separating them for purposes of avoiding Velcro overlapping. Well, first of all, in both of these situations, you want to keep side panels separate. And the 187 patent is not restricted to a hook and loop refashionable Velcro product. In both these situations, in pharmaceuticals as well, you want to keep these side panels separate until you get to the point in the process where you want to connect them. And the whole... My understanding of Famicanica, whatever you call it... Famicanica. Famicanica. I'll try to remember that. Famicanaca. Famicanica. The Italian reference. Yes. The whole point was to make sure that you maintained alignment of the front half over the back half of the diaper. And the board did not find that these yellow holding rods perform that particular function. My understanding of the Herman reference with the yellow holding rods is they don't start becoming relevant until each holding rod splits into two, and then at that point in time, they are serving its function of separating the front half from the back half so you can permit the tuck rod to come in and provide the crease for the fold. Right. So I guess there's the gap. There's one purpose for these rods here that, according to the board, is a different purpose from the purpose of the separating plates. Your Honor, this is the same problem that we had with the district court and the same problem we had with the board. And the issue is that everyone is focused actually on figure three. Maybe we ought to think that because both the district court and the board agreed that there's something to what they're saying. It's confusing, Your Honor. And the Federal Circuit looked at this last time and said, wait a minute, there are holding rods separating the side panels in Herman. But it goes beyond that to answer your question, Judge Chet. If you focus on figure four and you focus on figure 13, which the board didn't focus on, notwithstanding our arguments, notwithstanding we cited figure four probably a hundred times, when you get to this part of the process, which is a critical part of the process, you brought the ends of the product together, but you still want to keep the side panels which are in green separate. The only thing that's keeping those side panels in green separate are the holding rods. And that's exactly what we have in the 187 patent. Why is that necessarily so when I can see space, a gap between the actual yellow rods and those green side panels in complete distinction from figure 16 when the yellow rods finally split into two. And now it's quite clear that each of the individual yellow rods are pressed up against the side panels. Your Honor, it's a good question. Figure 13 is a schematic drawing. If you look at the… But why did figure 13 look the way it looked when figure 16 looks the way it looks? I don't have an explanation for why the draftsman did it, Your Honor. But I can tell you this. When you have these grippers, 64 and 66, holding the two parts of this pant together, right together, these rods, this pant is right up against these rods, which is shown down here in figure 4. It just has to be. It has to wrap around those rods. And those rods, and we know that because… So it's a patent draftsman's error in showing the space between the yellow rods and the side panels in figures 13, 14, 15, but showing no gap or space at all in figure 16. I don't know how he described 16, but I don't believe it's an error in 13 because he says it's a schematic drawing. It's a cross-section and it's schematic, so it's not supposed to be the reality of what's happening, which we really see in figure 13. If we conclude that the yellow holding rods do not offer an alignment function, then is this case over? No. And that's the critical part here, Your Honor. We argued two things. We argued separation and alignment, and we argued there was a motivation to combine to have separation. And the separation is exactly what the separation is in the 187 patent. It's just a partition. It's belts and suspenders. It's a redundancy. Yeah. The last time you were here, the Federal Circuit specifically said, unlike what you quoted, but specifically said whether or not those rods serve the function that you claim that they're serving is a question of fact for litigation.  So you're saying that we're all confused, or the board and the district court were confused, but did they make a factual determination based on a fair debate between the parties? Your Honor, they made a factual determination based on alignment only. They ignored separation. Their analysis has nothing to do with separation, notwithstanding the fact that we argued separation and alignment both, and notwithstanding that the examiner argued separation. So there's no deference here on separation. The board missed that. And on alignment, we believe that deference isn't due because the board focused on the wrong figures. The board, when they talk about this, they talk about figure three, and their whole argument is that in figure three, there's no alignment because this training pan in gray is not touching the holding rod in yellow. But four seconds down this process, it is. And that's what we see in figure four, and there it is touching. And frankly, at this stage in the process where you have to seal, you have to cut away the way, the only thing that's supporting this training pan, the only thing that's contributing to alignment are the holding rods and the grippers. And that's it. There's nothing else that's keeping this exactly where it should be. So we believe no deference is due because they missed the separation argument completely, and on alignment, they were focused on figure three. That's what they talk about, and they were not focused on figure four. Where does Herman, the reference itself, in a particular column and line, explain what the role is for the holding rods before they split into two? There's no explanation other than the explanation in the 187 patent. Both patents read exactly the same way. Okay, so just so I can confirm, you agree with me that there's nothing in the Herman patent disclosure that explains what role these holding rods have before they split into two? The only thing that we have in the Herman reference is... The answer yes? The answer to your question is specifically yes. Generally, there's a section in the patent, which again, the board did not cite to, that talks about orientation. And it talks about orientation during the folding process, the sealing process, and the cutting process. And the only thing that can give you the orientation during those three processes, the only things that are touching this training pant are the holding rods and the grippers. So by implication, it says something. Does it say something explicitly? No. But neither does the 187 patent. Is orientation alignment in this situation? I believe it is, Your Honor. It can be different, correct? I'm sorry? It can be different. Orientation does not have to be alignment. The patent actually talks about orientation in two ways. It talks about a planner orientation, which is what the grippers do to stretch it out. It then talks about keeping the pant in the proper orientation for the folding, the sealing, the joining, and then the cutting. And that's the holding rods and the grippers together. Just so I understand your proposed combination, it would be not to remove anything from the Italian reference. It would be to keep it as it is, but then on top of that insert Herman's holding rods. Is that right? Insert Herman's holding rods in the same location where the 187 patent has it separated. Yes. I mean, basically you've got, and we're looking at file mechanic of the blue brief at 14, you've got the training pant 21. We see the side panels 26 and 23. The holding rods would go right between them, and they would be belts and suspenders just the same way they are in the 187 patent to keep in case the vacuum fails or there's a momentary glitch in the vacuum. And in both situations, the 187 patent and these holding rods, they're really doing the same thing. They're serving the belt and suspenders a redundancy. And this is what we argued to the board. This is what the board did not address at all. Okay, you're into your rebuttal. You want to take the rest of your time? All right. Feel free to use the blow-up. Once they bring them in here, they're fair game. If you don't need them, don't worry about it either. Well, good morning, Your Honors, and may it please the court. The board's holding that the examiner failed to establish a prima facie case of obviousness should be affirmed for three reasons. The first being that substantial evidence does support the board's finding that the examiner's articulated reason for combining the famiconic and the Herma references was based on a factually incorrect assertion as well as there was no rational underpinning. Second, the board's finding in that regard was dispositive of its ultimate conclusion, absent any other reason to make that combination. And third, because the substitute reasons that Helen has raised on appeal for combining the references were never raised to the examiner, the board in this instance could not have erred by failing to consider those reasons. Now, I want to address this concept of the – well, there's two concepts that Mr. George raised that I want to address. One is that the argument goes – Let's go back a little bit. Did you say that the arguments that are being made today were not raised before the board? We argued in our brief that – First Quality in the blue brief asserted that there is a number of other rationales or reasons for combining those references that the board erred in failing to consider. And in that instance, none of those reasons, as we asserted in our red brief, none of those reasons were raised to the examiner. And so the examiner never had an opportunity to consider those. Were they raised to the board? What's that? Were they raised to the board? They – well, so it's interesting. That's the thing that happened when they went to the gray brief. In our red brief, we asserted that none of these arguments had been raised to the examiner, and they came back in the gray brief and said, well, we did raise some of these to the board. And now we've got two issues here – or two problems with that. One is in Rambis v. Wray, the court affirmed that the board's examination, its role is limited to examining the examiner's decision. And then you have a line of cases that we discussed in our brief. The board can always do new grounds of rejection, right? It's in their discretion to do that. They don't – it's not required that they actually do it. And in this instance, what they're asserting is that the board, on their own, should have considered these other six rationales for making those combinations, even though they had never been presented to the examiner. And we have the cases – But if those rationales are presented to the board, the board just can't ignore them at that point, correct? Well, there's two issues with that as well. One is if those – in an inter-parties re-examination, 37 CFR 41.68 prevents a requester of Pelley from proposing new grounds of rejection in their appeal brief. To the extent that those were not raised to the examiner and those were – constituted new grounds of rejection, then they were improperly in front of the board. Right. So the board has the discretion to come up with a new ground of rejection but no obligation to do so. They have no obligation to do so. And we also pointed out in our brief the three recent cases that were in front of this court. They were Rexnor v. Capos, Randall v. Ray, and Temple Lighting v. Tivoli. In each one of those cases, the board had reversed the examiner based on the examiner's rejection. And this court in those instances said that the requester of Pelley there could support the examiner's rejection on any grounds that were supported by the record. And in those specific cases, this court found that the arguments that were – that they relied on on appeal had indeed been raised in the reexamination record to the examiner. We don't have that in this case. So the board could not have erred in this case. And the interesting thing that happened in their gray brief when they switched their citations from the record to the arguments they made in their briefing to the board for the first time as well as to arguments they made for the first time during an oral argument during a hearing, they're basically admitting at that point that the arguments they're raising now were not the ones they raised to the examiner. We still even question whether those arguments were even raised to the board. If you look at the arguments in front of the board, the thrust of those rejections, I believe, were still along the grounds of the alignment reasoning that the board had already considered and rejected. Okay, so let's focus on the decision that the board actually made. So how do the holding rods of Herman not meet the claim language of the 187? The holding rods of Herman don't meet the claim language of the 187 because they're not separation members. They're not doing what the 187 separation members do. What do they do? What do you see as the holding rods of Herman? What's their function? Well, Herman, as the board found, Herman expressly teaches that the purpose of those holding rods is to prevent contraction of the product after the sides have already been sealed and it's been cut away from the grippers. And the board also found that— But you look at Herman, and is there not holding rods both pre-sealing and after sealing? There is. So when you look at the abstract— What does it do in the pre-sealing process? The short answer is nothing. The abstract of Herman is clear as to why those holding rods are even there in the first place. And that is, the abstract of Herman says, A holding rod extends longitudinally and is received within the garment as it is folded over. So we're talking about as it's folded over here. To hold it in a laterally stretched condition after it's released from the engaging members. So what you're facing here is the real purpose of the holding rods is to prevent contraction after it's been cut from the gripping members. The reason why these holding rods have to extend up here is you have to get them in place inside of where it's supposed to be sealed at the time you're doing the folding. Because once you've folded it over here, to try to thread these holding rods through this small opening would be a very difficult task, Isn't that the job of the spacers under Famicania? Excuse me? Isn't that the job that the spacers do? The same function that we see in the other prior reference? Well, Famiconica uses conveyors to do that. And they use conveyors to hold the entire side panel. And they only leave a small part of the wings coming off the conveyors. What prevents contraction in Famiconia? The conveyors. So if I could direct you to, for example, in the red brief at page 14. So you see there a comparison of the 187 patent with what the belt in Famiconica would look like when it's suctioning. And what you see there is that almost the entire sides of the side panels there are suctioned onto that vacuum. So the vacuum conveyor in Famiconica is holding the entire product. It's already doing the separation. There is no need for anything else there to help that out. When you compare that to figure three of the 190 and you see what's going on with the side panels in that case, in the 187, the side panels, contrary to what we heard, the side panels are not suctioned to the vacuum conveyors at all. The side panels are completely free. They're floating in air. In fact, it's the entire side panel, not just the edge where the fasteners are, but it's the entire side panel. And so in the 187 patent, those separation members have to be there to stop those fasteners from inadvertently contacting either each other or the backside of the other side panel because they're going to get stuck together before they can get downstream and properly aligned and fastened. In fact, in the 187 patent, it's specifically directed to the folding, whether these side panels are actually aligned in the 187. When you say getting stuck together, is that the same as when you reference the contracting? No. When we say stuck together, because we're using like Velcro fasteners, so we don't want, for example, if you see in the embodiment that's in figure three, both fasteners are on the different sides of the side panels. In this instance, if the separation members weren't there, the hook material from the one side would bump into the backside of the other side panel and would stick to it. And you wouldn't be able to get it done and fold it around later. So the purpose of the separation members is to just keep things status quo until we can get these side panels further downstream. Why wouldn't it be obvious to do that? Why wouldn't the nature of the problem be solved, which is to avoid the fasteners from the top half and the back half to connect with each other? The obvious solution would be to put a little physical barrier in between those two fasteners. Well, when you're looking at this relative to the prior art, what we have in front of us is we have Herman and we have Famiconica. And in both of those cases, they're based on the premise of controlling the entire product. So Herman has the gripping members all the way out there at the edges. It's holding everything so that those... . . . . . . . . . .